UNITED STATES of America

v.

Robert Otha JONES.

Crim. No. 72-265.

United States District Court,
E. D. Pennsylvania.

Nov. 24, 1975.

Kenneth Dixon, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Robert A. Stein, Stephen A. Madva, Defender Ass'n of Philadelphia, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court on the defendant's Motion for an Arrest of Judgment, or Judgment of Acquittal, after a jury verdict of guilty on Count II of a three count indictment charging the defendant with possession with intent to distribute a Schedule I narcotic drug controlled substance, in violation of 21 U.S.C. § 841(a)(1). The defendant was originally found guilty by a jury on Count II of the indictment on August 2, 1972. That same jury found the defendant not guilty of the offense charged in Count I, distribution of heroin, and the Court granted the government's motion to dismiss Count III which charged the defendant with possession of heroin in

violation of 21 U.S.C. § 844(a). The Court of Appeals reversed the defendant's original 1972 conviction and ordered a new trial in an opinion dated February 20, 1974. *United States v. Jones*, 3 Cir., 492 F.2d 239. The defendant was subsequently retried on Count II of the indictment and after a five day jury trial ending on July 16, 1974, was again found guilty of possession with intent to distribute heroin. The defendant's post-trial motion which attacks his 1974 conviction on a variety of grounds was timely filed on July 22, 1974. The Court has determined that the defendant's motion in connection with the finding of guilty at the second trial is without merit and must be denied.

*Sufficiency of the Evidence.*

At trial, the Court denied the defendant's oral motion for a judgment of acquittal based on the sufficiency of the evidence which was made after the government closed its case and was renewed at the conclusion of the trial. The defendant contends that these rulings were in error and that the government's evidence was insufficient as a matter of law to sustain his conviction. In reviewing the denial of a motion for judgment of acquittal, the pertinent question is whether the trial court had reason to believe that there was sufficient evidence on which the jury could find guilt beyond a reasonable doubt. *United States v. Leach*, 427 F.2d 1107 (1st Cir. 1970). It is not for the Court, ruling on a motion for a judgment of acquittal, to assess the credibility of witnesses or to weigh the evidence. 2 *Wright, Federal Practice and Procedure: Criminal* § 467, at 259. Rather, the Court must view the evidence in a light most favorable to the government. *United States v. Armocida*, 515 F.2d 29 (3d Cir. 1975); *United States v. Pratt*, 429 F.2d 690 (3d Cir. 1970). If a conviction is based on circumstantial evidence, the evidence need not be inconsistent with every conclusion save that of guilt, provided it does establish a case from which the jury can find the de-

fendant guilty beyond a reasonable doubt. *United States v. Giuliano*, 263 F.2d 582 (3d Cir. 1959). Applying this test, and viewing the evidence most favorable to the government, we conclude that there was more than sufficient evidence for the jury reasonably to find the defendant guilty beyond a reasonable doubt.

On August 26, 1971 Special Agent Glenn C. Brown of the Drug Enforcement Agency (DEA) was working on special assignment in an undercover capacity in Philadelphia. After receiving a telephone call at approximately 10:00 p. m., Agent Brown, accompanied by another Special Agent, Joseph McMillan, proceeded to the Wanda Inn, located at 12th and Mount Vernon Streets in Philadelphia. Shortly after entering the Wanda Inn, the agents were joined by a government informant, Aubrey Lewis. Soon thereafter, the agents and informant Lewis were joined by the defendant. The defendant and Agent Brown then entered into a conversation during which the defendant offered to sell Agent Brown one and one half ounces of heroin for $1,800.00. The defendant told Agent Brown that the heroin was of such quality that it could take a "five cut". Agent Brown testified that he then told the defendant that he would have to have a sample of the heroin before he would pay him any money. The defendant left the bar and returned in five or ten minutes and told Agent Brown that the requested sample would arrive shortly. Thereafter, the defendant left the bar again and re-entered at approximately 11:30 that night.

Upon returning, the defendant took a seat at the bar apart from the agents and the informant. He motioned to informant Lewis who got up from his stool, walked over to the defendant and engaged in a conversation with him of less than two minutes. Agent Brown testified that he saw the movement of hands between the defendant and informant Lewis while the two were having their discussion. Upon the conclu-

sion of their discussion, informant Lewis left the defendant and returned directly to Agent Brown and handed him two glassine bags which contained a white powder. Agent Brown immediately called the defendant over to where he was sitting and showed the two glassine bags to the defendant and acted as though he was requesting an explanation of their contents. The defendant then pointed to the two bags and told Agent Brown that the larger bag was ready to be cut and the smaller bag was ready for the street. Agent Brown then told the defendant that he and McMillan were leaving the bar for the purpose of making a test on the contents of the two bags. The defendant replied that he would wait until they returned.

Agents Brown and McMillan then left the Wanda Inn. They met two other DEA Special Agents, John McCready and Donald Abrams, who conducted a field test to determine the presence of an opium derivative. After receiving a positive result from the field test at about midnight, Agents Brown and McMillan returned to the Wanda Inn where they again talked to the defendant who told them that he had left the bar for a short time and discovered that he was being followed and that he recognized an undercover officer outside the bar. The defendant then said that under the circumstances he was calling the deal off.

The defendant contends that the evidence presented by the government in this case was insufficient to convict the defendant of possession with intent to distribute heroin. This contention is no doubt precipitated by the following passage from the Court of Appeals' opinion following the 1971 conviction.

[I]t is necessary also that the government surmount the hurdle posed by *United States v. Pratt*, 429 F.2d 690 (3d Cir. 1970). Since a new trial must be had, however, we do not pass upon those issues here. 492 F.2d at 241.

In *Pratt*, the defendant and a codefendant, Wilson, were charged with the illegal sale of heroin. Wilson pleaded guilty and did not testify at Pratt's trial. The evidence upon which Pratt was convicted showed that an undercover agent negotiated with Pratt's codefendant Wilson for the purchase of heroin. After a trip in a car with the undercover agent, Wilson left the car and walked some distance and met Pratt. Pratt then left Wilson, walked past the agent's car and looked in the windshield. Pratt then returned to Wilson. Both Pratt and Wilson got into the agent's car and the three drove away. Wilson then gave the agent two glassine bags of heroin. Both the undercover agent and a policeman who observed the conversations between Pratt and Wilson testified that they did not see any package or object pass from Pratt to Wilson. The Third Circuit Court of Appeals reversed Pratt's conviction for the illegal sale of heroin holding that the evidence was insufficient to establish that Pratt ever had the two bags of heroin in his possession or that he sold them to the undercover agent.

The evidence presented in the instant case differs substantially from that produced by the government in *Pratt*. Here, Agent Brown testified that he conducted negotiations for the sale of the heroin directly with the defendant and the defendant stated to Brown that he would sell to him one and one half ounces of heroin for $1,800.00. In *Pratt*, the negotiations for the sale of heroin were conducted only with the codefendant, and not, as here, with the defendant himself. Furthermore, the testimony in this case showed that after the negotiations as to the price of the heroin, the defendant told the undercover agent that he would leave the bar and return with samples of the heroin; that the defendant left the bar and upon his return a short time later he took a seat at the bar across from the undercover agent; that he immediately called the informant to come join him; that the

undercover agent witnessed the movement of the defendant's hands and the informant's hands; that the informant remained within the view of the undercover agent and returned directly to him at which time the informant handed the undercover agent two glassine bags; that the undercover agent immediately called the defendant over to where he was sitting and showed the two glassine bags to the defendant and acted as though he was requesting an explanation of their content; and that the defendant pointed to the two bags and told Agent Brown that the larger bag was ready to be cut and that the smaller bag was ready for the street.

We are satisfied that the evidence outlined above, viewed in a light most favorable to the government, is sufficient to support a jury verdict of guilty on the Court charging possession with intent to distribute heroin. The jury could have reasonably concluded beyond a reasonable doubt from the evidence presented that the defendant had either actual or constructive possession of the heroin involved herein, *United States v. Crippen*, 459 F.2d 1387 (3d Cir. 1972), with the requisite intent to distribute.

*Absence of Informant at Trial.*

 Prior to the first trial, defense counsel was advised by the Government at a pre-trial conference that an informant was involved in the case. The government, however, did not disclose the name of the informant until the day of the jury selection at which time it told the defendant and his counsel that the government did not intend to call the informant as a government witness. It was also on that same day of the jury selection that Agent Brown made a telephone call to the informant's residence in an effort to learn of his whereabouts. When the call by Agent Brown proved unproductive, two other government agents were dispatched to the informant's presumed residence, and later to his place of employment, in an effort to locate him. These efforts proved unproductive and the government was unable to produce the informant so that the defendant could determine whether the informant's testimony would be helpful to his defense. On appeal, our Circuit Court held that in view of the fact that the Government had been aware for two months prior to the trial that the informant could not be located, the government's efforts on the opening day of the trial were not sufficient to fulfill its obligation to make the informant available to the defendant for his use at trial. The Court stated in its opinion:

Whether an informant's identity should be disclosed depends on the circumstances of each case and requires a balancing of the public's right to the flow of information against the requirements of providing a fair trial to the defendant. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L. Ed.2d 639 (1957). If for legitimate reasons, the government decides not to identify the informant in advance of trial, then absent special circumstances, it must take reasonable steps to have him available when the case is called, should a ruling in favor of disclosure be made. *United States v. Leon*, 487 F.2d 389 (9th Cir. 1973); *United States v. Barnes*, 486 F.2d 776 (8th Cir. 1973); *Velarde-Villareal v. United States*, 354 F.2d 9 (9th Cir. 1965); *United States v. D'Angiolillo*, 340 F.2d 453 (2d Cir. 1965); *United States v. Clarke, supra*. In this case the failure of the government to undertake a serious search for the informant in advance of the date set for trial has not been explained, and hence in the circumstances here we do not consider that the obligation to produce the witness has been met. *U. S. v. Jones*, 492 F.2d at 242.

Mr. Fioravanti, the Assistant United States Attorney who was assigned this case after the first trial, testified that after the mandate from the Court of Appeals he instructed Special Agent Abrams of DEA to make a search for Mr. Lewis and to produce him in Mr.

Fioravanti's office. Agent Abrams was able to locate Mr. Lewis and brought him to Mr. Fioravanti's office during the month of March, 1974. At that meeting, attended by Mr. Abrams and John Buchanan, an undercover police officer attached to DEA Task Force, Mr. Lewis told Mr. Fioravanti that he was frightened and did not want to testify against Mr. Jones. Mr. Fioravanti told Mr. Lewis that he would probably be required to appear at trial and that Mr. Lewis should keep Agent Abrams apprised of his whereabouts at all times. Mr. Lewis assured Mr. Fioravanti that he would work with Agent Abrams. Thereafter, until May of 1974 (when Agent Abrams was transferred to Germany), Mr. Fioravanti received periodic reports from Agent Abrams that he was maintaining contact with Aubrey Lewis. After Agent Abrams left for Germany on special assignment in May of 1974, Mr. Fioravanti directed Officer Buchanan to keep in contact with Mr. Lewis. However, Officer Buchanan was not able to locate Mr. Lewis. During this period Mr. Fioravanti was asked by the defendant's counsel if he would make Mr. Lewis available for an interview. Mr. Fioravanti told defense counsel that when Mr. Lewis was located, and before trial, defense counsel would have an opportunity to interview Mr. Lewis. On June 25 or 26, the prosecution of this case was transferred to another Assistant United States Attorney, Susan Harmon.

On June 27, 1974, Ms. Harmon issued a subpoena for Aubrey Lewis. Special Agent John Smith of DEA was given the subpoena for service. On June 28, 1974, after researching DEA files to obtain an identification of Mr. Lewis and to ascertain the locations at which Mr. Lewis had reportedly been living, Agent Smith visited four locations in North Philadelphia. These locations were (1) 2908 Westmont Street, the residence of Mr. Lewis' wife, Charlotte Lewis; (2) 1917 North Darien Street, an address obtained from Mr. Lewis' attorney and at which he had recently resided; (3) 1226 Tucker Street, reportedly a previous address of Mr. Lewis' father and; (4) 1212 Poplar Street, allegedly the address of Mr. Lewis' mother, who had died four or five years earlier. Agent Smith was unable to obtain any useful information as to the whereabouts of Aubrey Lewis at any of these locations. Nevertheless, on July 2, 1974, Agent Smith returned to the Tucker Street and the North Darien Street locations but was again unsuccessful in his attempt to obtain information concerning Mr. Lewis' whereabouts.

Agent Smith also contacted the Court of Common Pleas of Philadelphia County on June 28, 1974, and learned that Mr. Lewis was scheduled for a court appearance on July 18, 1974. On July 1, 1974, Agent Smith continued his search for Mr. Lewis by contacting Officer John Buchanan. He was told by Officer Buchanan that there was a possibility that Mr. Lewis was living at 3516 Warnock Street. However, Agent Smith did not locate Mr. Lewis at that address. On July 9, 1974, Agent Smith spoke with Aubrey Lewis' wife. Mrs. Lewis told Agent Smith that she did not know where Mr. Lewis was residing and that Mr. Lewis was not residing with her and that he provided her with no financial assistance.

Special Agent Ralph Carter of the FBI then testified that his office received a letter from Mr. Dixon, an Assistant United States Attorney who was the government's trial attorney at the second trial, which letter requested help from the FBI in locating Mr. Lewis. Agent Carter conducted a full indices search on Mr. Lewis. The search revealed no information, which was reported to Agent Smith on July 8, 1974.

On July 5, 1975, the emergency Judge signed a bench warrant for the arrest of Aubrey Lewis. Kenneth Burke, a Deputy United States Marshal, attempted to serve the bench warrant on July 9, 1974, at 2908 Westmont Street in Philadelphia. Mrs. Lewis met Deputy Marshal Burke at that location and informed him

that she did not know the whereabouts of Mr. Lewis. Deputy Marshal Burke was never able to serve the bench warrant. On July 3, 1974, defendant's counsel issued a subpoena for Aubrey Lewis to testify in this case. On July 6, 1974, Deputy Marshal Wayne Dorsche received the assignment to serve the subpoena. The subpoena issued by defense counsel listed five addresses in North Philadelphia for Aubrey Lewis. Deputy Marshal Dorsche testified that he visited all five of these locations but was unable to locate Mr. Lewis.

The jury was sworn at this the second trial on July 10, 1974 and the Court ordered the government to continue its efforts to locate Mr. Lewis. Officer Buchanan testified that he continued his search for Aubrey Lewis from April, 1974 until the end of the second trial. The defendant contends that the government again failed at this second trial to meet its obligation to make Mr. Lewis available for the defendant's use at trial. It is the defendant's contention that the efforts of the government to secure the presence of Mr. Lewis reveals a failure on the part of the government to exercise appropriate diligence to make the informant available.

The government does not have an absolute duty to make an informant available to the defendant for his use at trial. *United States v. Ferguson,* 162 U.S. App.D.C. 268, 498 F.2d 1001 (1974); *cert. denied* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 145; *United States v. Moore,* 446 F.2d 448 (3d Cir. 1971); *United States v. White,* 324 F.2d 814 (2d Cir. 1963); *United States v. Cimino,* 321 F. 2d 509 (2d Cir. 1963); *Williams v. United States,* 273 F.2d 781 (9th Cir. 1959). The United States Supreme Court in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), held that the identity of an informant, or of the contents of his com-

munication, must be disclosed to a defendant where it is relevant and where it would be helpful to the defense, or is essential to a trial. In *Roviaro,* the government refused throughout the trial to reveal the identity of the informant to the defendant. The *Roviaro* rule has no application to a situation such as the instant case where the identity of the informant was disclosed to the defendant almost two years in advance of the second trial.

The Second Circuit has summarized the government's duty in connection with making an informant available to the defendant for his use at trial in *United States v. D'Angiolillo,* 340 F.2d 453 (2d Cir. 1965):

> The rule emerging from these and earlier decisions is that, where the informer's testimony may be relevant to the defense, the defendant is entitled to his name, to such information as the government may have concerning his whereabouts, and to reasonable cooperation in securing his appearance. 340 F.2d at 455. (footnote omitted).

In sending this case back for a second trial, our Circuit Court was dealing with a situation in which the government had not revealed the name of the informant in advance of the trial and in their opinion the government had not made a sufficient effort to have the informant available to the defendant. This was not the situation in connection with the second trial. The defendant was aware of the identity of the informant from August 2, 1972, when, during the first trial of this case, the Court ordered the government to reveal the identity of the informant and to assist the defendant in locating him.[1] Furthermore, after the Circuit Court ordered a retrial of the case, the evidence shows that the government made a continuing effort to maintain personal contact with the in-

---

1. In *United States v. Ferguson,* 162 U.S. App.D.C. 268, 498 F.2d 1001 (1974), the Court held that a revelation of the identity of the informant ten days before the trial was sufficient to avoid reversal of the conviction under the *Roviaro* rationale. 498 F. 2d at 1005.

formant. These efforts were at first successful but later proved futile. The Court is satisfied that in the circumstances of this case the government has more than satisfied its obligation to make Mr. Lewis available for the defendant's use at trial.

On July 18, 1974, two days after the jury returned its verdict of guilty, Mr. Lewis was found and brought in on the bench warrant. On July 19, 1974, a hearing was held at which Mr. Lewis was represented by counsel. He testified that he was instructed by Mr. Fioravanti to maintain contact with Agent Abrams. Mr. Lewis, however, refused to answer any questions concerning the transactions involving the defendant on the night of August 26, 1971 on the ground that such answers might tend to incriminate him. He did state, however, that he was afraid to testify and that had he been produced at trial, he would not have testified for the defendant but would have asserted his Fifth Amendment right against self-incrimination. (N.T. Post Trial Hearing, 68, 69). The defendant was therefore unable to show that Aubrey Lewis would have been of any assistance to the defendant had he been available at the second trial. *See United States v. Ferguson*, 162 U.S. App.D.C. 268, 498 F.2d 1001, 1006 (1974).

*Assertion by Informant of His Fifth Amendment Right Against Self-Incrimination.*

 Mr. Lewis was brought before the Court on July 19, 1974, at which time he had counsel. The Court told all counsel that it was seeking from Mr. Lewis testimony concerning two areas: (1) Where Mr. Lewis had been prior to and during the trial of this case, and (2) What testimony Mr. Lewis would have given had he been called to testify as a witness at the trial. Mr. Lewis answered some questions and the Court directed him to answer other questions; but when he was questioned concerning the facts surrounding the transactions at the Wanda Inn on the night of August 26, 1971, Mr. Lewis was permitted to assert his Fifth Amendment right against self incrimination. The defendant contends that permitting Mr. Lewis to assert his Fifth Amendment right violated the defendant's right to due process and that the government was required to grant Mr. Lewis immunity to compel his testimony.

In *United States v. Mahady & Mahady*, 512 F.2d 521 (3d Cir. 1975), our Circuit Court reiterated the circumstances in which a witness may invoke the privilege against self incrimination and the responsibility of the court when ruling upon a claim of privilege as follows:

The Supreme Court has specifically held that the privilege against self-incrimination may be invoked by a compelled witness *in any proceeding* when his answers to questions "might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

In so holding the Court said at page 77, 94 S.Ct. at page 322:

"The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.' *The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal,* where the answers might incriminate him in future criminal proceedings." (emphasis supplied).

It is also settled that "[t]he privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute *but likewise embraces those which would furnish a link in the chain of evidence* needed to prosecute the claimant for a federal crime."

*Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (emphasis supplied); cited and applied in *Malloy v. Hogan*, 378 U.S. 1, 11, 84 S.Ct. 1489, 12 L. Ed.2d 653 (1954) and *In re U. S. Hoffman Can Corp.*, 373 F.2d 622, 628 (3d Cir. 1967).

*Hoffman v. United States, supra,* also held while the privilege "must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer," and "his say-so does not of itself establish the hazard of incrimination," it is the initial responsibility of the court "to say whether his silence is justified . . ., and to require him to answer if "it clearly appears to the court that he is mistaken.'" 341 U.S. at 486, 71 S.Ct. at 818.

*Hoffman* cautioned that "if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee," and "[t]o sustain the privilege, it need only be evidence from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. at 486–487, 71 S.Ct. at 818.

*Hoffman* stressed that the self-incrimination privilege *"must be accorded liberal construction in favor of the right it was intended to secure."* 341 U.S. at 486, 71 S.Ct. at 818. (emphasis supplied).

We, too, have, in prior decisions, stressed that "a heavy duty rests on the judge before whom the privilege is invoked," and "[t]he trial court should not deem itself to be 'a mere keeper of the ring' in the tradition of the English civil law." 512 F.2d at 525. (footnotes omitted).

The Court ruled on the Fifth Amendment self incrimination claim of Mr. Lewis without objection by the defendant. The Court found that if Mr. Lewis were required to answer questions concerning his involvement at the Wanda Inn on August 26, 1971, there was a conceivable possibility that Mr. Lewis might tend to incriminate himself. *American Cyanamid Company v. Sharff,* 309 F.2d 790 (3d Cir. 1962). This ruling was not error. It was obvious to the Court that there were several conceivable possibilities in connection with Mr. Lewis' involvement at the Wanda Inn which might have incriminated him.

Furthermore, when the Court permitted Mr. Lewis to assert his Fifth Amendment right at the post trial hearing, no objection was made by the defendant. (N.T. Post Trial Hearing, 44, 58, 59).[2] In the absence of plain error, matters not called to the attention of the trial judge cannot be subsequently raised in the post trial stages of the proceeding. *United States v. Bryant,* 480 F.2d 785 (2d Cir. 1973); *United States v. Hykel,* 461 F.2d 721, 728 (3d Cir. 1972). The purpose of Rule 51 of the Federal Rules of Criminal Procedure is to require counsel to make known to the Court an objection to a proposed action of the Court, and the grounds therefore, in order to assure that the trial court makes an informed decision and to allow the judge and opposing counsel to take whatever corrective action is needed. *United States v. Walker,* 146 U.S.App. D.C. 95, 449 F.2d 1171 (1971). It was never argued to the Court that it was denying the defendant's right to due process in permitting Mr. Lewis to assert his Fifth Amendment right and no plain error has been committed in allowing Mr. Lewis to assert his right.

---

2. Indeed, only the prosecuting attorney argued that any answer given by Mr. Lewis could not incriminate him.

The defendant now contends for the first time that this ruling denied the defendant due process of law and that the government should have granted Mr. Lewis immunity so that the defendant could have obtained his testimony. The cases addressing this issue have uniformly held that the trial court has no power to grant immunity to a witness whose testimony the defendant may wish to offer, and the government cannot be forced to grant such immunity. *United States v. Berrigan,* 482 F.2d 171 (3d Cir. 1973); *United States v. Jenkins,* 470 F.2d 1061 (9th Cir. 1972), *cert. den.* 411 U.S. 920, 93 S.Ct. 1544, 36 L. Ed.2d 313 (1973); *United States v. Lyon,* 397 F.2d 505 (7th Cir. 1968), *cert. den.* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968); *Morrison v. United States,* 124 U.S.App.D.C. 330, 365 F.2d 521 (1966); *Earl v. United States,* 124 U.S.App.D.C. 77, 361 F.2d 531 (1966). We therefore hold that Mr. Lewis had the right to assert his privilege against self incrimination and that the Court properly ruled on his assertion of that right. Furthermore, the government was not required to grant immunity and its failure to do so did not deprive the defendant of due process.

*Use of Former Testimony.*

■■■■■ At trial, the defendant objected to the introduction into evidence of the exhibits which were identified as containing heroin. (N.T. 3–59). Specifically, the defendant contended that there were two missing links in the chain of custody of the drugs in that no testimony had been introduced concerning which heroin samples were mailed to New York and that no testimony was introduced concerning the custody of the drugs from the time that the envelopes left the government laboratory in New York after their analysis until they arrived in the courtroom in Philadelphia for the first trial of this case in August of 1972. The government had produced this testimony at the first trial through Agent Donald Abrams who testified that he mailed the heroin samples to New York as instructed and that he received the analyzed envelopes from New York and kept them in his custody during the trial. On the fourth day of the second trial, the government asked for a continuance to produce Agent Abrams who was out of the country on assignment with DEA in Germany or in the alternative to allow his testimony concerning the chain of custody at the first trial to be read to the jury. The defendant opposed the requested continuance and the Court ruled that Agent Abrams' former testimony in connection with the chain of custody could be read to the jury. (N.T. 4–16, 4–32). The defendant contends that this ruling was error.

Rule 804(b) of the Federal Rules of Evidence provides:

Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Rule 804(a)(5) provides that a witness is unavailable as a witness when the declarant

is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means.

At the time of the second trial, Agent Abrams was on special DEA assignment in Germany. The testimony which the government sought to introduce at the second trial consisted of one full page of transcript and related solely to the chain of custody of the drugs. Agent Abrams' testimony in connection with his mailing of the drugs to the DEA laboratory in

New York and his receipt of the exhibit from New York was uncontradicted at the first trial. Furthermore, the legal and factual issues at the first trial at which Agent Abrams was present and testified were identical to the issues at the second trial, and the defendant had a full opportunity for cross-examination of Agent Abrams as to all his testimony. Furthermore, as pointed out later in this opinion, the testimony of Abrams in connection with the chain of custody was merely cumulative and not necessary to the government's case.[3] Requiring the government to bring Agent Abrams from Germany in order to give his brief testimony concerning the chain of custody which was uncontradicted by the defendant at the first trial and which was cumulative would have been unreasonable and overburdensome.

The defendant argues, however, that permitting this brief testimony by Agent Abrams from the first trial to be read to the jury denied him his Sixth Amendment right of confrontation. The Supreme Court has made it plain that although the confrontation clause of the Sixth Amendment and the hearsay rules overlap, the two are not co-extensive. Thus, even statements properly admitted under the hearsay rules, as was the former testimony of Agent Abrams, may be examined by the Court to assure that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Menichino*, 497 F.2d 935 (5th Cir. 1974). Many years ago the Supreme Court stated that "[t]he primary object of the [Confrontation Clause of the Sixth Amendment] . . . was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness . . . ." *Mattox v. United States*, 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). "[A] major reason underlying the constitu-

tional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him." *Pointer v. State of Texas*, 380 U.S. 400, 407, 408, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965). The Supreme Court has found many situations in which out of court statements admitted into evidence at trial have not violated the defendant's right of confrontation. *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (dying declaration); *Delaney v. United States*, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462 (1924); *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (declarations of co-conspirator); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (former testimony). Our Third Circuit has also stated that although the opportunity of the jury to examine the demeanor of the witness is of high significance, it is nevertheless well settled that it is not an essential ingredient of the confrontation privilege; the privilege is satisfied if the defendant is accorded the right of cross-examination. *Government of the Virgin Islands v. Aquino*, 378 F.2d 540, 548 (1967). Under the circumstances of this case, where the former testimony was limited to the chain of custody of the drugs involved and did not involve testimony concerning the actual transaction for which the defendant was indicted, and where the defendant was afforded a full opportunity to cross-examine the witness at the first trial, we find no violation of the defendant's Sixth Amendment right of confrontation where the former testimony was admitted.

The defendant further argues that his right of confrontation was violated because Agent Abrams was not called as a witness in connection with his relationship with the informant, Aubrey Lewis. Agent Abrams was assigned the responsibility of keeping in touch with Mr. Lewis and the defendant contends that he should have been permitted to ques-

---

3. See p. 543 *infra*.

tion Agent Abrams in connection with his performance of those duties as well as his relationship with Mr. Lewis. We find this contention without merit. As heretofore stated, we have found that the government met its obligation to produce the informant for trial. The government met its burden without the testimony of Agent Abrams, who was in Germany at the time of the second trial. The government simply has no duty to place on the witness stand every person with some knowledge of the circumstances surrounding the case. *United States v. Polisi,* 416 F.2d 573 (2d Cir. 1969); *Eberhart v. United States,* 262 F.2d 421 (9th Cir. 1958); *Curtis v. Rives,* 75 U.S.App.D.C. 66, 123 F.2d 936 (1941).

*Chain of Custody.*

The defendant argues that the exhibits containing heroin which were introduced at trial were insufficiently identified because the government failed to properly establish their chain of custody. The defendant contends that the failure of the government to call the informant who carried the narcotics across the room from the defendant to Agent Brown creates a fatal gap in the chain of custody. The defendant also claims that the fact that Agents Abrams and McCready placed the envelopes containing the heroin samples into the safe without permanently sealing or initialing them creates a second gap in the chain of custody.

Tangible objects become admissible in evidence only when proof of their original acquisition and subsequent custody forges their connection with the accused and the criminal offense. *Gass v. United States,* 135 U.S.App.D.C. 11, 416 F.2d 767 (1969). The government must establish that the evidence is in substantially the same condition as it was when it was originally seized. *United States v. Clark,* 425 F.2d 827, 833 (3d Cir. 1970). The government must eliminate possibilities of misidentification and adulteration, not absolutely, but as a matter of reasonable certainty. *United*

*States v. Robinson,* 145 U.S.App.D.C. 46, 447 F.2d 1215, 1220 (1971).

Under the circumstances of this case, the government was not obligated to call the informant to establish the chain of custody. As heretofore discussed, the evidence showed that the defendant and Agent Brown had a conversation during which the defendant offered to sell Agent Brown one and one-half ounces of heroin for $1,800.00; that Agent Brown told the defendant that he would have to have a sample of the heroin before he would pay the defendant any money; that after leaving the bar for five or ten minutes, the defendant returned to Agent Brown and told the undercover agent that he would have the requested sample in a short time; that the defendant left the bar again and upon his return a short time later he took a seat at the bar across from the undercover agent; that the defendant immediately called the informant to come join him; that the undercover agent witnessed the movement of the defendant's hands and the informant's hands; that the informant remained within the view of the undercover agent and returned directly to him, at which time the informant handed the undercover agent two glassine bags; that the undercover agent immediately called the defendant over to where he was sitting and showed the two glassine bags to the defendant and acted as though he was requesting an explanation of their contents; and that the defendant pointed to the two bags and told Agent Brown that the larger bag was ready to be cut and that the smaller bag was ready for the street. Thus, even accepting the defendant's assumption that the chain of custody commenced with the informant's receipt of the drugs, the evidence is more than sufficient to establish with reasonable certainty that the drugs which the defendant handed the informant were the identical drugs produced at trial.

After the envelopes containing the drugs were placed in the hands of Agent Brown the government's testimony was

more than sufficient to establish the chain of custody with reasonable certainty. After leaving the Wanda Inn with the two envelopes, Agent Brown met the acting group supervisor, Agent John McCready, and gave Agent McCready the two envelopes obtained from the informant. Agent McCready then testified that he and Agent Abrams, who was with Agent McCready and was a member of the surveillance team, conducted a Marquis test to determine whether the envelopes contained an opium derivative. The field test results were positive and Agents Brown and McMillan initialed and dated the two envelopes and left them with Agent McCready. Early on the morning of August 27, 1971, Agents McCready and Abrams took the two envelopes which were left with them by Agents Brown and McMillan to DEA headquarters, placed them in a lock seal envelope and locked them in a safe. Later that same morning, Agents McCready and Abrams, in the presence of Agents Brown and McMillan, took the envelopes from the safe, weighed the contents and placed the contents in lock seal envelopes. Agent McCready then gave the envelopes to Agent Abrams for mailing to New York via registered mail, return receipt requested. The testimony of Agent Abrams at the first trial was that he mailed the envelopes in accordance with Agent McCready's instruction. At the second trial, the government introduced the return receipt corresponding to the envelope mailed to the chemist in New York. The government also produced Jack Fascinello, a DEA chemist, who testified that on August 30, 1971, he received and signed the two envelopes. Mr. Fascinello then testified that he broke the seals and analyzed the contents of the two envelopes, found that each contained heroin, and then placed the two envelopes in the safe at the laboratory in New York in two lock seal envelopes. The Court then permitted the testimony of Agent Abrams at the first trial to be read to the jury. He had testified that he received the two envelopes

from New York on July 31, 1972, the day before the first trial began, and that the exhibits were in his custody until the first trial ended. Finally, at the conclusion of the first trial on August 3, 1972, Agent Abrams gave the two envelopes to Agent Paul Britt, who stored them in a vault until the second trial of this case.

We find that the government has eliminated the possibilities of misidentification and adulteration to a reasonable certainty in this case. We find that the government has met this burden even without the testimony of Agent Abrams at the first trial. The fact that Agent McCready did not see Agent Abrams place envelopes in the mail is not a fatal gap in the chain of custody in light of the fact that each agent who was involved in the case initialed and dated the sealed envelopes before they were given to Agent Abrams to mail to New York and that the DEA chemist, Mr. Fascinello, identified the lock seal envelopes with their initials thereon as the ones he opened and analyzed. (N.T. 3–23). The return receipt which the government produced is also evidence that Agent Abrams did mail the envelopes as directed by Agent McCready.

Likewise, the testimony of Agent Abrams at the first trial in connection with his receipt of the two envelopes from New York was merely cumulative and not necessary to establish a proper chain of custody because after analyzing the two envelopes which he received from Philadelphia, Mr. Fascinello placed the evidence in two lock seal envelopes and stored them in the safe at the New York laboratory. The two lock seal envelopes, initialed by all the agents as well as the chemist, Mr. Fascinello, were opened in Court in the presence of the jury. Therefore, even without Agent Abrams' testimony at the first trial, the chain of custody was established to a reasonable certainty.

*Double Jeopardy.*

Prior to the second trial, the defendant moved to dismiss Count II

of this indictment contending that the principles of collateral estoppel as embodied in the double jeopardy clause of the Fifth Amendment precluded his retrial on Count II. At the first trial, the jury found the defendant not guilty on Count I charging him with distribution of heroin and guilty on Count II, which charged the defendant with possession with intent to distribute heroin. Count III, charging mere possession of heroin, was dismissed by the Court after a motion by the government. In a Memorandum and Order dated May 3, 1974, the Court denied the defendant's motion to dismiss based on the double jeopardy clause, which motion was filed prior to the second jury trial. As we stated in our Memorandum and Order of May 3, 1974, the law is clear that the doctrine of collateral estoppel has no application to separate counts tried together under a single indictment. *United States v. Finnerty,* 470 F.2d 78, 79 (3d Cir. 1972); *United States v. Cantu,* 469 F.2d 679, 680 (5th Cir. 1972); *United States v. Schor,* 418 F.2d 26, 28 (2d Cir. 1969); *United States v. Carbone,* 378 F.2d 420 (2d Cir. 1967), *cert. denied,* 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262; *United States v. King,* 373 F.2d 813 (2d Cir. 1967); *United States v. Maybury,* 274 F.2d 899 (2d Cir. 1960). Furthermore, the defendant has not called to our attention any case where the doctrine of collateral estoppel has been applied to an acquittal on one count of an indictment where the defendant was found guilty on another count which was tried at the same time.

There is no inconsistency in a jury having found the defendant not guilty at the first trial of the charge of distribution while on the same evidence finding the defendant guilty of possession with intent to distribute.[4]

Furthermore, in *United States v. Vastine,* 363 F.2d 853 (3d Cir. 1966), our Circuit Court reiterated the well established rule that an acquittal on one or more counts of an indictment containing several counts does not invalidate a verdict of guilty on another count even where the same evidence is offered in support of each count by stating:

> Where different offenses are charged in separate counts of a single indictment, an acquittal on one or more of the counts does not invalidate a verdict of guilty on another even where the same evidence is offered in support of each count. A rational consistency in the verdicts of a jury on the separate counts of a single indictment is not required. . . . The reason for the rule appears to be predicated on special considerations relating to the peculiar role of the jury. *Vastine,* at 854. (citations omitted).

Therefore, we can find no merit to the defendant's argument that the government was precluded from presenting evidence relating to distribution in connection with Count II which charged the defendant with possession with intent to distribute.

*The Court's Charge.*

(a) Constructive Possession.

The defendant contends that the Court erred in its charge to the jury that there are two kinds of possession, actual and constructive, and that a finding by the jury that the defendant had either actual or constructive possession of the narcotics involved would be sufficient as to the element of possession. The law is well settled that a person who, although not in actual possession of a thing, knowingly has both the power and the intention at a given time to exercise some dominion or control over a thing, either directly or through another person, is in constructive possession. *United States v. Crippen,* 459 F.2d 1387 (3d Cir. 1972). The defendant con-

---

4. The evidence presented was that the defendant gave the two envelopes to an intermediary, the informant, who then gave the envelopes to Agent Brown. The jury may well have determined that this evidence did not constitute distribution of heroin by the defendant.

tends, however, that constructive possession could not have occurred in this case because the defendant had no dominion and control over the informant, Aubrey Lewis.

We find no error in charging the jury on constructive possession under the circumstances of this case. The evidence presented showed that the defendant and Agent Brown had a conversation during which the defendant offered to sell Agent Brown one and one half ounces of heroin for $1,800.00; that Agent Brown told the defendant that he would have to have a sample of the heroin before he would pay the defendant any money; that after leaving the bar for five or ten minutes the defendant returned to Agent Brown and told the undercover agent that he would have the requested sample in a short time; that the defendant left the bar again and upon his return a short time later he took a seat at the bar across from the undercover agent; that the defendant immediately called the informant to come join him; that the undercover agent witnessed the movement of the defendant's hands and the informant's hands; that the informant remained within the view of the undercover agent and returned directly to him, at which time the informant handed the undercover agent two glassine bags; that the undercover agent immediately called the defendant over to where he was sitting and showed the two glassine bags to the defendant and acted as though he was requesting an explanation of their contents; and that the defendant pointed to the two bags and told Agent Brown that the larger bag was ready to be cut and that the smaller bag was ready for the street. Although there was no direct evidence that the defendant had actual possession of the heroin, there was sufficient evidence from which the jury could properly so infer. The jury could also find from the evidence set forth above that the defendant had constructive possession in that he promised to deliver samples to Agent Brown and then after their delivery he came over to Agent Brown and explained the contents of each of the two sample envelopes. In light of all the evidence, there was no error in giving the charge on constructive possession.

Furthermore, Rule 30 of the Federal Rules of Criminal Procedure provides that "no party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The defendant never objected to the Court's instruction on constructive possession and cannot now raise the issue, absent plain error. *United States v. Hines,* 470 F.2d 225 (3d Cir. 1972); *United States v. Kenny,* 462 F.2d 1205 (3d Cir. 1972). Defense counsel had an obligation to make a timely objection specifically calling to the Court's attention the allegedly erroneous instruction in order that the Court could have taken corrective action if warranted. *United States v. Stubin,* 446 F.2d 457 (3d Cir. 1971). The Court was never asked to correct its charge with respect to constructive possession, and as heretofore explained no error has been committed in so charging.

(b) Missing Witness Charge.

The defendant requested that the Court give a "missing witness" charge to the jury. Accordingly, the Court charged the jury as follows:

Now if it is peculiarly within the power of either party to produce a witness who could give material testimony on an issue in the case, failure to call that witness may give rise to an inference that his testimony would be unfavorable to that party. However, no such conclusion is to be drawn by you with regard to a witness who is equally available to both parties or where the testimony of the witness would be merely cumulative. (N.T. 4–116).

The defendant argues that Agent Abrams was a missing witness both as to the issue of the government's efforts to produce the informant and as to the chain of custody. He contends that the charge given was insufficient to convey to the jury the inference to which he is entitled. The defendant also argues that by ruling that a portion of Agent Abrams' former testimony could be read to the jury, the Court deprived him of the opportunity to argue that Agent Abrams was a missing witness.

In *United States v. Hines,* 470 F.2d 225 (1972), our Circuit Court stated:

> The applicability of a "missing witness" inference is based on the "simple proposition that if a party who has evidence which bears on the issues fails to present it, it must be presumed that such evidence would be detrimental to his cause. For obvious reasons of practicality, evidence which would be merely cumulative could not raise such a presumption." Clearly every absent but producible witness possessing some knowledge of the facts need not be made the subject of the inference. Often all that can be inferred is that the witness' testimony would not be *helpful* to a party, not that the testimony would have been *adverse*. The witness must appear to have "special information relevant to the case, so that his testimony would not merely be cumulative." 470 F.2d at 230 (citations omitted).

The Court has thoroughly discussed its ruling in connection with permitting the reading at the second trial of a portion of Agent Abrams' testimony at the first trial concerning the chain of custody. As pointed out in *Hines,* the facts in this case simply do not justify an inference that Agent Abrams' testimony would have been unfavorable to the government. At the first trial, Agent Abrams testified not only concerning the chain of custody but gave other testimony which was not shaken on cross-examination. Agent Abrams' testimony at the first trial was wholly favorable to

the government and it is unreasonable to infer that his testimony at a second trial would have been otherwise. Agent Abrams' testimony would have been merely cumulative. Of course, with respect to the issue of the government's efforts to produce the informant and the role played by Agent Abrams in securing the informant's presence at the second trial, the jury, as was argued to them by the defendant's counsel, could under the Court's charge draw an inference unfavorable to the government from Agent Abrams' failure to testify at the second trial.

As the Court stated in *Hines, supra*:

> If a party intends to argue to the jury for an inference to be derived from the absence of a witness, "an appropriate instruction should be given defining for the jury the conditions under which the inference might be properly drawn. Only by such a practice can the . . . jury be informed sufficiently to enable it to intelligently discharge its function in that regard." 470 F.2d at 231.

The charge as given by the Court was clearly proper under the circumstances of this case.

(c) Reasonable Efforts to Locate Informant.

■■ In its charge, the Court not only gave a "missing witness" charge but, at the defendant's request, the Court instructed the jury as follows:

> Now in this case the Government was obligated to use reasonable efforts to produce the informant, Aubrey Lewis, as a witness in this case and you must consider the evidence that was presented by the Government as to their efforts to produce Aubrey Lewis and you must determine whether the Government made a reasonable effort to produce Aubrey Lewis. (N.T. 4–116).

The Court also instructed the jury that:

> If you find that the Government did not use reasonable efforts then you

may apply the inference that his testimony would have been adverse, that is, adverse to the Government's case; but if you find that the Government did use reasonable efforts to produce the witness-informant, then you need not apply the unfavorable-inference rule. (N.T. 4–116).

The defendant contends that this portion of the charge was error. The defendant contends that the Court was required to direct the jury that an unfavorable inference should be drawn from the absence of the informant. The Court has previously discussed the law as to the duty of the government to make the informant available to the defendant for trial. After hearing testimony out of the presence of the jury, the court determined that the government had met its obligation, and that the informant was not absent due to any fault on the government's part. The Court then ruled that the defendant, if he determined to do so, had a right to comment to the jury on the absence of the informant and if the defendant chose to argue to the jury that the government had not made a reasonable effort to produce the informant, that the government could present evidence concerning its efforts to make the informant available for the defendant's use at trial. (N.T. 3–5). The Court permitted the testimony concerning the government's efforts to produce the informant and the defendant did argue the informant's absence to the jury. (N.T. 4–88). "It would present an anomaly in the law if, while one party may comment upon the absence of an opposing party's witness, the opposing party were not permitted to introduce evidence to excuse the absence of such witness." *Schumacher v. United States,* 216 F.2d 780, 788 (8th Cir. 1954) (citations omitted). There was no error in the instruction given to the jury with respect to the informant's absence or the Court's rulings in connection therewith.

Accordingly, the following Order is entered:

## ORDER

And now, this 24th day of November, 1975, upon consideration of the defendant's Motion for an Arrest of Judgment, or Judgment of Acquittal, it is hereby ordered that the Motion is denied.